# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

CATHERINE FONTANAR SAIN,
*acting on behalf of children, V.R.S. and L.P.S.,*

      Petitioner,

v.                               Case No. 8:21-cv-01229-KKM-AAS

LANCE PAUL SAIN,

      Respondent.

_____/

## ORDER

The COVID-19 pandemic has disrupted the lives of millions of people across the globe. This case presents yet one illustration of the unanticipated consequences of shuttering businesses (in this instance, a school) and closing borders (here, China's). In March 2020, when China prevented Respondent Lance Paul Sain, along with his two minor children, V.R.S. and L.P.S., from returning to their home in Shenzhen, China, the three of them traveled to the United Kingdom to stay with Petitioner Catherine Fontanar Sain, the mother of the minor children. Ms. Sain set her hopes on making the relocation permanent: she encouraged Mr. Sain to apply for teaching jobs in the United Kingdom and offered for the children to reside with her while Mr. Sain secured permanent housing. Neither dream came to fruition. Instead, Mr. Sain and V.R.S. and L.P.S. secured invitation letters from the Chinese government to return and purchased

airline tickets to China. When the Chinese government unexpectedly foreclosed their return once again in November 2020, the three of them (all U.S. citizens) traveled to Tampa, Florida, to wait out the COVID-related restrictions.

Ms. Sain now petitions under the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention) and the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001 et seq., to return V.R.S. and L.P.S. to the United Kingdom. (Doc. 1). She alleges that Mr. Sain wrongfully removed their children in December 2020, after she convinced a court in the United Kingdom to issue a "Prohibited Steps" Order barring Mr. Sain from taking the children outside of that country. Upon her initial filing, this Court enjoined Mr. Sain from removing V.R.S. and L.P.S. from the Tampa Division of the Middle District of Florida during the pendency of this action. But, after an evidentiary hearing, including testimony from both parents, this Court concludes it lacks authority to order the return of the children, as China is the children's "habitual residence," not the United Kingdom. In the light of this fatal flaw, the Court dissolves the temporary order restraining Mr. Sain's movements with the minors and denies Ms. Sain's petition.

## I.      Procedural History

On May 20, 2021, Ms. Sain filed a petition for the return of V.R.S. and L.P.S. to the United Kingdom under the Hague Convention and filed an *ex parte* motion requesting a Temporary Restraining Order (TRO) and the scheduling of an expedited hearing (Doc. 2). The Court issued a TRO the following day. (Doc. 8).

After delaying the merits hearing upon Mr. Sain's request for additional time to retain counsel, the Court held a hearing on Ms. Sain's petition on June 14, 2021. As permitted by Court order (Doc. 17), Ms. Sain testified from England through Zoom, and Mr. Sain, who ultimately proceeded pro se, cross-examined her. Mr. Sain then testified in his case-in-chief and was cross-examined by Ms. Sain's counsel. The Court concluded the hearing with an *in camera* interview of V.R.S. and L.P.S.

## II.    Evidence Presented

In 2005, Mr. and Ms. Sain met online. Ms. Sain was and is a Filipino citizen; Mr. Sain was and is an American citizen. After communicating online for approximately five months, Mr. Sain, who lived in Las Vegas, Nevada, visited Ms. Sain in the Philippines for three weeks. The two continued corresponding after Mr. Sain returned to the United States, and Mr. Sain returned to the Philippines to visit Ms. Sain again at the end of 2005. This time, Mr. Sain never left.[1] Mr. and Ms. Sain rented an apartment together, ran a small business together, and—in 2008—welcomed their first child, V.R.S., in the Philippines. As a result, V.R.S. is a dual American and Filipino citizen.

Unfortunately, the couple was unable to financially support their growing family. Seeking better employment opportunities, Mr. Sain accepted a job teaching English in China, and the family moved to Guangzhou, China, in November 2008. In May 2009, Ms. Sain gave birth to their second child, L.P.S., who is an American citizen. In March

---

[1] Whether lawful or not, the Sains purportedly married in 2006 and the Court refers to them by their married last name without making any findings of fact about the validity of the marriage.

2010, Mr. Sain started teaching at a different school, and the family moved to Tianjin, China, for his job. Mr. Sain worked while Ms. Sain cared for the children and homeschooled them when they reached school-age years.

In 2012, Mr. and Ms. Sain separated, although they continued to live in the same house for the benefit of the children. Ms. Sain began a relationship with another man and in 2015, to be closer to Ms. Sain, her boyfriend moved from England to China. Ms. Sain then moved in with her boyfriend, who had rented an apartment nearby. Because of her proximity, Ms. Sain continued to homeschool the children and prepare meals for them on a frequent, albeit not daily, basis. In 2016, Ms. Sain and her boyfriend moved to Shenzhen, China, which is six hours away from Tianjin by train and an hour away by plane. Mr. Sain homeschooled the children in Ms. Sain's absence, and the three visited Ms. Sain in Shenzhen on at least one occasion. Ultimately, Mr. Sain found employment in Shenzhen so the children could be closer to their mother, but by the time they moved to Shenzhen in 2018, Ms. Sain had moved to England with her boyfriend. In 2019, V.R.S. and L.P.S. started attending the school where Mr. Sain taught in Shenzhen.

Although Ms. Sain moved to England in May 2017, she did not obtain a resident visa from the United Kingdom until November 2018. During this time, Ms. Sain gave birth to her boyfriend's child. Ms. Sain would occasionally talk to V.R.S and L.P.S. through Skype (although not daily), and Mr. Sain and the children visited Ms. Sain in England for four weeks in 2018. Ms. Sain visited Mr. Sain and the children in China twice while she was living in England: once in January 2019 and once in March 2019.

In November 2019, Mr. Sain, Ms. Sain, and the children spent a week together in Hong Kong, sharing one hotel room.

In January 2020, Mr. Sain, Ms. Sain, Ms. Sain's boyfriend, and the three children met in the Philippines for Ms. Sain's family reunion; Ms. Sain traveled from England on January 24, 2020, and Mr. Sain and the children traveled from China one day later. When they arrived in the Philippines, the group spent their days vacationing together, including activities like island-hopping, hiking, swimming, go-carting, and eating out. Mr. Sain and the children were scheduled to return to China on February 12, 2020. But shortly before their departure, they discovered that their flight was canceled and that China had closed its borders due to COVID-19 restrictions. With no indication of when China would reopen its borders, the Sains agreed that Mr. Sain and the children would stay in England until they could return home to China. Ms. Sain flew back to England on March 4, 2020, and Mr. Sain and the children followed her there on March 8, 2020.

Mr. Sain and the children stayed with Ms. Sain and her boyfriend (and their youngest child) from March through August of 2020, weathering the height of the pandemic and United Kingdom lockdowns in her one-bedroom flat. After five months of escalating tension, Mr. Sain told Ms. Sain that he and the children were going to stay with his friend in Wales. On August 17, 2020, Ms. Sain came home from work to oppose Mr. Sain leaving. A dispute ensued, and Ms. Sain's friend called the police. After interviewing Mr. Sain, Ms. Sain, and the children separately, the police allowed Mr. Sain,

as the children's father, to take the children to Wales on holiday. Mr. Sain and the children departed for Wales later that evening.

After discovering through a private investigator that Mr. Sain and the children were not living at the address in Wales that he had provided her, Ms. Sain initiated a Prohibited Steps proceeding in Wales during the first week of October 2020. The Welsh court set a hearing for December 8, 2020, and it sent notification to Mr. Sain at the address that Ms. Sain provided. Following the hearing, at which Ms. Sain testified and at which Mr. Sain failed to appear, the Welsh court issued a Prohibited Steps Order, which enjoins a parent from taking a child outside of the United Kingdom for a period of over one month without consent from both parents. (Petitioner's Exhibit I).

At some point after the issuance of the Prohibited Steps Order, Ms. Sain learned that Mr. Sain and the children had left the United Kingdom. After inquiring with the port police, Ms. Sain discovered that, on December 7, 2020, Mr. Sain and the children had traveled to the United States. She then completed an application with the International Child Abduction & Contact Unit (ICACU). (Petitioner's Exhibit J). Eventually, Ms. Sain hired another private investigator, who located Mr. Sain and the children in the Tampa area, culminating in this petition under the Hague Convention.

### a. Ms. Sain's Testimony

At the hearing on June 14, 2021, Ms. Sain testified to the following. When she moved to Shenzhen, China, Ms. Sain communicated with V.R.S. and L.P.S. nearly every day and visited them three times a month. She eventually moved to England because

she could not find work in China, and Ms. Sain paid for the children's homeschool curriculum while she lived in England. While residing in England, she sent clothes, toys, and books to the children, totaling approximately six to seven thousand pounds per year.

During her family reunion in the Philippines at the beginning of 2020, Ms. Sain paid for the family's accommodations, and Mr. and Ms. Sain split the cost of food. When Mr. and Ms. Sain discovered that China closed its border due to the pandemic, they agreed that Mr. Sain and the children would stay with Ms. Sain until April 2, 2020—the date that they believed China's borders would reopen. Once it became apparent that China was not reopening in the near future, Ms. Sain discussed the possibility of Mr. Sain finding employment in England. She even helped him apply for teaching positions. Further complicating his return, Mr. Sain's Chinese visa expired on July 31, 2020. (Petitioner's Exhibit Q). Per Ms. Sain, Mr. Sain lost his job in China and agreed to relocate to England. Mr. Sain did not, however, take any of the job interviews that he was offered.

While Mr. Sain and the children were staying with Ms. Sain in Surrey, England, they went on walks in the park, read books, and swam in the pool. Per lockdown protocol, they interacted in close quarters with only one other family, who also had children. But the compact, one-bedroom flat offered little privacy, and quarrelling and chaos often ensued. Because of the tension, Ms. Sain encouraged Mr. Sain to rent a separate apartment nearby. Unable to afford one in Surrey, Mr. Sain arranged for the

children and himself to stay with a friend in Wales, which was a three- to four-hour train ride away. Ms. Sain did not have an objection to them living in Wales as long as the children were safe. If the address that Mr. Sain provided was accurate, Ms. Sain approved of the situation.

On August 17, 2020, Mr. Sain bombarded Ms. Sain with text messages while she was at work. He sent her pictures of his and the children's packed bags and told Ms. Sain that he had booked their train tickets and that they were going to Wales that afternoon. Ms. Sain responded that she did not agree to him taking the children to Wales without confirming their accommodations were appropriate.[2] Mr. Sain insisted; he was leaving with the children and asked Ms. Sain to come home immediately to say goodbye.

When Ms. Sain arrived home, Mr. Sain screamed at her for voicing opposition to his plan of relocating the children to Wales. The dispute prompted Ms. Sain's friend to call the police. Upon arrival, the police interviewed Mr. Sain, Ms. Sain, and the children separately. Ultimately, the police allowed Mr. Sain, as the children's father, to take the children to Wales for a holiday. According to Ms. Sain, Mr. Sain was attempting to relocate to Wales.

---

[2] At some point, Ms. Sain discovered that the Wales address Mr. Sain provided to her did not exist. It is unclear whether she discovered this on or before August 17, 2020, or after Mr. Sain and the children moved to Wales.

Concerned for the children, Ms. Sain contacted the Welsh police to do a welfare check. The police informed her that neither Mr. Sain nor Mr. Sain's friend resided at the address that she gave (which was the address that Mr. Sain provided her). After Mr. Sain's refusal to tell her where they were staying, Ms. Sain filed a missing persons report in Wales and, in September 2020, she hired a private investigator to discover where they were staying. Shortly thereafter, Ms. Sain petitioned the Welsh court for a Prohibited Steps Order and eventually filed this action when she discovered that Mr. Sain and the children were in the United States.

### b. Mr. Sain's Testimony

In his case-in-chief, Mr. Sain testified to the following. After meeting Ms. Sain and moving to the Philippines, they started a family and Mr. Sain taught math. During the time that they lived together in China, Ms. Sain held several jobs and Mr. Sain continued his teaching career. Ms. Sain stayed home with the children, and a nanny and other tutors helped her homeschool V.R.S. and L.P.S. Because Mr. Sain's credit card had expired, Ms. Sain paid for the children's homeschool curriculum and then Mr. Sain repaid her through an online application. After Mr. and Ms. Sain separated, Ms. Sain moved to Shenzhen—which is at the other end of China from Tianjin—with her boyfriend, who accepted employment there. According to Mr. Sain, he and the children visited Ms. Sain in Shenzhen, but Ms. Sain did not visit them three times a month. When Ms. Sain moved, she became the "vacation mom," who did not help financially.

For the children to be in closer proximity to their mother, Mr. Sain and the children moved to Shenzhen, China. But, by the time Mr. Sain accepted a job offer and moved to Shenzhen with the children, Ms. Sain, who was pregnant with her boyfriend's child, had moved to England. Mr. Sain started a new teaching position in Shenzhen and enrolled the children in that school. The children enjoyed biking to school together every morning and attending classes, and they performed well academically and socially with the other students. V.R.S. and L.P.S also participated in taekwondo for years. In sum, the trio settled into their Shenzhen life.

In January 2020, Mr. Sain and the children met Ms. Sain, her boyfriend, and their daughter in the Philippines for Ms. Sain's family reunion. The two families interacted amicably during the trip. Mr. and Ms. Sain split the cost of accommodations between themselves or between themselves and Ms. Sain's boyfriend. The first trouble arose when Mr. Sain and the children discovered that they could not return to China due to the border closures. China had put restrictions on Filipinos entering China, which prevented V.R.S. from returning because she was traveling under her Filipino passport. Mr. Sain apprised his employer of the situation, and the school extended Mr. Sain's vacation. Because at that time there were no restrictions imposed on travel from the United Kingdom to China, the Sains agreed that Mr. Sain and the children would first travel to the United Kingdom and attempt to reenter China from there.

Plan in order, Mr. Sain and the children flew to the United Kingdom and stayed with Ms. Sain, Ms. Sain's boyfriend, and their daughter in their one-bedroom flat,

which—considering the logistics of six people in a one-bedroom apartment—soon proved to be a challenge. Ms. Sain's boyfriend grew impatient and would stomp and slam things. Further, he struggled with a drinking problem and anger management, which escalated the already tense situation. At times, Ms. Sain's boyfriend spoke harshly to V.R.S. and L.P.S., insulting them and occasionally using profanity.

Mr. Sain's physical classroom transitioned to an online one due to the pandemic, and he worked remotely through July 2020.[3] In anticipation of the end of the school year, Mr. Sain looked for online work to financially support himself and the children until they were able to return to China. He interviewed for online positions on multiple occasions while in England. Ms. Sain was also pressuring Mr. Sain to stay permanently in the United Kingdom. To appease her, he sent Ms. Sain a cover letter and resume so that she would leave him alone. But he did not instruct her to apply for any position on his behalf, and he did not follow up on any employment inquiry she made.

Mr. Sain recognized the negative effect that the overcrowded living situation had on the children. Unable to return to China and realizing that he could not afford to rent an apartment nearby, Mr. Sain planned to move himself and the children into a house with his Welsh friend to save money until they could return to China. He provided advance notice of his plan to Ms. Sain and asked that she come home on August 17, 2020, so that she could say goodbye to the children. Although Ms. Sain and her

---

[3] Mr. Sain admitted a copy of his last pay stub as proof of employment through July 2020. (Respondent's Exhibit H.3).

boyfriend knew that Mr. Sain had purchased taxi and train tickets for that day, they intentionally stayed away from the flat later than normal so that Mr. Sain and the children would miss the train. In fact, they even left their young daughter with Mr. Sain so that he could not leave until they returned home. Despite calls and messages, Ms. Sain refused to return home at her normal hour. Consequently, Mr. Sain and the children missed their taxi. Finally, when Ms. Sain arrived home with her friend, they started yelling at Mr. Sain and insulting him. Ms. Sain's friend then called the police. After the police separately interviewed Mr. Sain, Ms. Sain, and the children, Mr. Sain and the children left for Wales. Per Mr. Sain, he moved to Wales so that the children could live in a safer environment and did not provide Ms. Sain their address for the children's protection.

During the fall of 2020, Mr. Sain continually tried to return to China with the children. He secured invitation letters from the Chinese government to allow him to return to work in China and bought plane tickets for them to return on November 5, 2020. Unfortunately, less than twenty-four hours before the scheduled November flight, China indefinitely suspended entry for foreigners with Chinese visas, thwarting Mr. Sain's plan to return. (Respondent's Exhibit F). And although he had given up his apartment in Shenzhen in October, Mr. Sain had all of his and the children's personal belongings moved into a storage shed in China, which he paid for monthly.

Because Mr. Sain's tourist visa in the United Kingdom initially expired in September 2020, he repeatedly requested assurances from the immigration services in

the United Kingdom to avoid being deemed an overstayer. (Respondent's Exhibit I). His last extension was granted through December 31, 2020. (*Id.*). Unable to return to China and with the time remaining on his tourist visa dwindling, Mr. Sain and the children left Wales for the United States on December 7, 2020.[4] Mr. Sain testified that he was not aware of the Prohibited Steps hearing before he left Wales and first learned of the legal proceedings in January 2021, when he received notice by email of a second hearing held in the Welsh court. (Respondent's Exhibit J).

### c. The Children's Testimony

In an *in camera* interview with the children, V.R.S. and L.P.S. testified that although they liked the United States just fine, they were waiting for China's borders to reopen so that they could return home. They testified that their friends, school, and most of their personal belongings were in China, and that, if given the choice, they would live in China with their dad. They expressed displeasure about the living arrangement with Ms. Sain and her boyfriend in England and stated that they largely played around the flat, went on walks, and saw tourist sites when they resided there.

### III. Legal Standard

Ratified by many nations, including the United States and the United Kingdom but notably not China, the Hague Convention, as implemented by ICARA, "ordinarily requires the prompt return of a child wrongfully removed or restrained away from the

---

[4] Neither Mr. nor Ms. Sain introduced evidence of V.R.S.'s or L.P.S.'s immigration status in the United Kingdom.

country in which she habitually resides." *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (citing Art. 12, Treaty Doc.). A removal or retention is "wrongful" if the child was removed from the child's habitual residence in violation of the parent's "rights of custody" and the parent was actually exercising those rights at the time of the removal or retention. *Abbott v. Abbott*, 560 U.S. 1, 8–9 (1983). "The Hague Convention ensures that in almost every circumstance, a custody dispute will begin in, and remain for resolution in, the country of the child's 'habitual residence.'" *Stirk v. Lopez*, No. 8:20-CV-2894-SDM-AAS, 2021 WL 1139664, at *3 (M.D. Fla. Mar. 25, 2021) (citing *Baran v. Beaty*, 526 F.3d 1340, 1344 (11th Cir. 2008)). And of course, the Hague Convention mandates the return of children between signatory states only. *See Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004).

To secure V.R.S. and L.P.S.'s return to the United Kingdom, Ms. Sain must show by a preponderance of the evidence that the children were wrongfully removed from their "habitual residence." 22 U.S.C. § 9003. Although neither the Hague Convention nor ICARA defines the term "habitual residence," the term's plain meaning at the time of the treaty's enactment was well-settled. *See Monasky*, 140 S. Ct. at 726. "A child 'resides' where she lives," *id.* (citing *Residence*, *Black's Law Dictionary* (5th ed. 1979)), and a "habitual" residence implies one that is "customary, usual, [or] of the nature of a habit," *id.* (quoting *Habitual*, *Black's Law Dictionary* (5th ed. 1979)); *see also id.* at 732 (Thomas, J., concurring in part and concurring in the judgment) (citing dictionary definitions from the 1970s and 1980s to define "habitual" as "customary" or "usual"

and "residence" as referring "to a personal presence at some place of abode, one's usual dwelling-place, or the act or fact of abiding or dwelling in a place for some time" (internal citations, alterations, and quotation marks omitted)). "[A] child's habitual residence depends on the particular circumstances of each case," not an actual agreement between a child's parents. *Id.* (majority opinion) at 726–27. Indeed, "locating a child's home is a fact-driven inquiry," which requires courts to be "sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 727 (quotation omitted).

"For older children capable of acclimating to their surroundings, courts have long recognized [that] facts indicating acclimatization will be highly relevant" in determining habitual residence. *Id.* For example, acclimatization might be shown through the child's "academic activities," "social engagements," "immigration status of child and parent," and "location of personal belongings." *Id.* at 727 n.3. And for other children, "especially those too young or otherwise unable to acclimate, [who] depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations." *Id.* at 727. No single fact is dispositive across all cases. *Id.* "Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Id.*

## IV. Analysis

The initial, and ultimately dispositive, inquiry before the Court is whether the United Kingdom is the children's habitual residence. After holding a full evidentiary hearing, reviewing the record, and considering the totality of the circumstances, the Court finds that it is not. Instead, nearly all evidence points to China as the children's habitual residence—the country where the children have lived nearly their entire lives until COVID-19 obstructed their return from a family vacation.

L.P.S. was born in China, and V.R.S. was less than one-year old when she moved there in 2008. In late January 2020, Mr. Sain and the children went to the Philippines for a family reunion with every intention of returning to China on February 12, 2020. China's pandemic-related border restrictions constitute the sole reason why their return was foiled. The Sains agree that their original plan involved Mr. Sain and the children staying with Ms. Sain only until China's borders reopened. Thus, the crux of the habitual residence determination turns on whether the children's nine-month stint[5] in the United Kingdom transformed their habitual residence from China to the United Kingdom. The Court finds that it did not.

First, there is little to no evidence of acclimatization in the United Kingdom by either V.R.S. or L.P.S., both of whom are young teenagers. *See Monasky*, 140 S. Ct. at

---

[5] The children stayed in England from March until August 2020 and stayed in Wales from August until the beginning of December 2020. Because England and Wales both comprise part of the United Kingdom, which is the signatory state to the Hague Convention, the Court considers them as a single state for purposes of the habitual residence determination.

727 (describing "acclimatization" as "highly relevant" for older children in determining habitual residence). They attended school in China; they never attended school in the United Kingdom. They had well-developed friendships in China; they denied being close friends with the children that Ms. Sain identified as their buddies back in England. They participated in taekwondo for years in China; they engaged in no extracurricular sports or similar activities in the United Kingdom. Instead, they spent their days as tourists, recounting in their *in camera* interview visits to sites they had already frequented on an earlier trip to England. To be sure, they left most of their toys and other belongings back in China, as one would if intending only to travel for vacation purposes. When the Court inquired as to where they felt most comfortable, their enthusiasm for returning to China, particularly Shenzhen, filled the room. They detailed how they enjoyed the coffee shops and school where they lived, which they termed "a jungle city." Their robust response in favor of China juxtaposed their discomfort with the crowded living conditions in England (in particular, their dislike of Ms. Sain's boyfriend) and their ambivalence about remaining in the United States. In sum, nothing indicated acclimatization to either the United Kingdom or the United States. They appear indefinitely suspended from returning to their only conception of their "customary" or "usual" place of abode. *See Monasky*, 140 S. Ct. at 726.

Even if the above facts are largely attributed to the pandemic-induced lockdowns, little evidence of the children's acclimatization otherwise exists in the United Kingdom. Although counsel for Ms. Sain represented that she thought the

children were using tourist visas while in the United Kingdom, neither party introduced evidence on this point. Further, the children's housing situations during the nine months were temporary and, by all accounts, not long-term solutions. Through evidence of flight plans and invitation letters, Mr. Sain showed that he and the children were actively trying to return to China. Mr. Sain also testified that, "I love everything about China," and the children emphatically concurred during the Court's *in camera* interview. To them, China was unquestionably home and, but for pandemic-related restrictions on travel into China, Mr. Sain, V.R.S., and L.P.S. would have immediately returned there in February 2020. Thus, considering the circumstances and evidence in this case, the children's habitual residence is plainly China. And being stranded in the United Kingdom for most of 2020 due to a global pandemic does not alter that conclusion.

Second, the Court credits Mr. Sain's testimony that he always intended to return to China and never intended to relocate to the United Kingdom. *See Monasky*, 140 S. Ct. at 727 (explaining that the habitual residence determination depends on the specific facts of the case and that the intentions of caregiving parents are relevant). As the nearly exclusive caregiver for the children for at least the last six years, Mr. Sain's intentions are highly informative, and the evidence supports his assertion. When Mr. Sain and the children were in England, they stayed in a temporary living situation—an overcrowded one-bedroom flat with Mr. Sain's estranged wife and her new boyfriend and child. Mr. Sain and the children's living situation in Wales was also temporary; they stayed with

Mr. Sain's friend to save money until they could return to China. Regarding employment, Mr. Sain specifically looked only for online work and refused to take interviews for jobs in England. Quite tellingly, Mr. Sain could not legally stay in the United Kingdom long-term with the children as he was there on an expired tourist visa. Although the United Kingdom granted him exceptional assurances—allowing him to stay during the assurance period without being regarded as an overstayer—the letters granting the assurances emphasized that they were "not an extension of [his] leave" and that he "must make plans to leave the UK prior to the date [his] assurance expires," lest he be classified as an overstayer. (Respondent's Exhibit I). Indeed, Mr. Sain cites the impending assurance period deadline as the reason he left for the United States with the children on December 7, 2020. Thus, far from indicating any intent to settle in the United Kingdom, the last confirmation of exceptional assurance that Mr. Sain received allowed him to remain in the United Kingdom until December 31, 2020, and stated that if he did "not leave on or before [that] date, [he] will be classed as an overstayer." (*Id.*).

Perhaps the best corroboration of Mr. Sain's testimony that he intended to return to China were his preparations to do so and his abiding connections back home. Throughout 2020, Mr. Sain was actively trying to find a way to leave the United Kingdom and return to China. After their initial February flight to China was canceled, Mr. Sain planned to return with the children to China in the second week of April. But then China announced that it was closing its borders indefinitely. Mr. Sain also acquired invitation letters—which were required by the government to return to his school in

China—for himself and his children in September 2020. (Respondent's Exhibit K). Mr. Sain subsequently booked a flight to China for himself and his children leaving on November 5, 2020. (Respondent's Exhibit F). But less than twenty-four hours before their flight, China announced that "non-Chinese nationals [would] not be allowed to travel to China until further notice even if holding a valid visa," and their flight was again canceled. (*Id.*). Throughout this time period, Mr. Sain paid monthly for a storage unit that housed his belongings back in China, and he testified that his girlfriend and community were located in China. Although Ms. Sain testified that Mr. Sain told her that he intended to relocate to the United Kingdom, her word—which the Court finds unreliable—is the only evidence for that.

The Court finds not credible Ms. Sain's contrary assertions. For example, she testified that Mr. Sain intended to relocate permanently to the United Kingdom once he realized that China's borders were closed indefinitely and that he sought her assistance in finding work. But Mr. Sain never followed up on the offered job interviews, an oddity if one were seeking employment. Ms. Sain also claimed that Mr. Sain was unemployed while living with her in England and denied that Mr. Sain was working online through July 2020. But the Court finds this claim not credible based on Mr. Sain's testimony and—importantly—proof of continued employment through his pay stub. Surely, with six individuals sharing a one-bedroom flat, all adults present would be amply aware of the happenings of the others. Therefore this Court finds it unlikely that Ms. Sain did not know of Mr. Sain's continued online teaching while he

lived with her. Further, Ms. Sain never presented any evidence that Mr. Sain or the children applied for resident visas, a prerequisite to permanent relocation and employment in the United Kingdom.

The Court finds Ms. Sain's testimony unreliable based on other omissions too. For example, except for one passing reference to splitting bills, Ms. Sain never referenced her boyfriend and her youngest child attending the family reunion in the Philippines during her testimony, despite all six people traveling and staying together in the same accommodations. She also largely ignored his presence in her testimony regarding the crowded living conditions when Mr. Sain and the children stayed with her in England. Additionally, on cross-examination, Ms. Sain claimed that Mr. Sain did not give her advanced notice of his departure date to Wales. But her testimony on direct examination and text messages in exhibits cast doubt on this claim and indicate that she did have prior knowledge of Mr. Sain's intention to move to Wales with the children. (Petitioner's Exhibit E). These are just a few instances where the Court finds Ms. Sain's testimony not to be credible or to be contradictory of other, more credible, evidence.

Ms. Sain points to the Prohibited Steps Order entered on December 8, 2020, for proof that the United Kingdom is the children's habitual residence. (Petitioner's Exhibit I). But the Welsh court issued the order after a hearing at which only Ms. Sain testified.[6] (*Id.*). Significantly, in the second order, which was issued on January 22, 2021, the Welsh

---

[6] Mr. Sain denied ever knowing about the hearing and order until January 2021.

court found that Mr. Sain agreed to "come to the [United Kingdom] with the children to await the relaxation of Covid restrictions"; that Ms. Sain's explanation of the "sequence of events raised concerns for the Court as to whether or not it had jurisdiction to make any orders in respect of the children"; and that the Court "was not persuaded to make any order in respect of the Children Act application until determination of the Hague Convention application." (Respondent's Exhibit J). Accordingly, the legal proceedings in the United Kingdom fail to support Ms. Sain's position. Quite the opposite: they indicate that the Welsh court shares the same concerns as this Court.

In the light of Ms. Sain's failure to establish the United Kingdom as the children's habitual residence, Ms. Sain has failed to satisfy the prima facie case of wrongful removal under ICARA. *See Calixto v. Lesmes*, 909 F.3d 1079, 1089 (11th Cir. 2018) (explaining that the question of whether the petitioner established a prima facie case of wrongful removal requiring the child's return to Colombia under the Hague Convention turned on whether the child's habitual residence was Colombia). Consequently, the Court need not address the remaining elements.[7] *See id.* (explaining

---

[7] Considering the Court's conclusion that the United Kingdom is not the children's habitual residence, any analysis of the remaining elements of the prima facie case of wrongful removal would prove awkward. For example, under the Hague Convention, Ms. Sain's custody rights are determined by the laws of the children's habitual residence—which is not the United Kingdom. *Monasky*, 140 S. Ct. at 723 ("The removal or retention is wrongful if done in violation of the custody laws of the child's habitual residence."). But it would be quite a mismatch for the Court to analyze Ms. Sain's exercise of her parental rights under the laws of China where China is not Ms. Sain's country of residence, a signatory to the Hague Convention, or the country to which Ms. Sain seeks her children's return.

that if Colombia was not established as the child's habitual residence as an initial matter, the child's retention in the United States was not wrongful and the petitioner's petition automatically fails). Additionally, in the light of Ms. Sain's failure to carry her burden of establishing a prima facie case of wrongful removal, the Court does not reach any affirmative defenses.[8]

Accordingly, it is **ORDERED**:

(1) Petitioner Catherine Fontanar Sain's petition for the children's return to the United Kingdom is **DENIED**.

(2) The United States Marshal is **DIRECTED** to serve this order on Mr. Sain. The United States Marshal is also **DIRECTED** to return to Mr. Sain all seized travel documents and passports.

(3) The temporary restraining order is **DISSOLVED**.

(4) The Clerk is directed to enter judgment for Respondent Lance Paul Sain and terminate any pending motions or deadlines and to close this case.

**ORDERED** in Tampa, Florida, on July 2, 2021.

Kathryn Kimball Mizelle
United States District Judge

---

[8] Mr. Sain did not clearly articulate a specific affirmative defense he sought to raise. In any event, the Court does not find Mr. Sain's evidence—which, at best, could be construed as potentially raising the defenses of a grave risk of harm to the children or the children's objection to being returned based on their maturity—sufficient to establish any affirmative defense.